22 N.J. Super. 344 (1952)
92 A.2d 47
DR. SIDNEY GREENSPAN OR SYLVESTER S. GARFIELD IN THE ALTERNATIVE, PLAINTIFFS-APPELLANTS,
v.
THOMAS SLATE AND NELDA SLATE, HIS WIFE, DEFENDANTS-RESPONDENTS.
Superior Court of New Jersey, Appellate Division.
Argued October 20, 1952.
Decided October 28, 1952.
*345 Before Judges JAYNE, PROCTOR and SCHETTINO.
Mr. Sylvester S. Garfield argued the cause for appellants.
No appearance for respondents.
The opinion of the court was delivered by JAYNE, S.J.A.D.
There nestles in the substance of this case the question whether the law of this State generates an obligation of a parent to pay the reasonable fee of a physician who, without any express authority of the parent, renders necessary professional services to the parent's infant child.
Here is an epitome of the factual story. Mr. Sylvester S. Garfield, a member of the bar, was the Good Samaritan. Barbara Slate, the 17-year-old daughter of the defendants, was the afflicted. Mrs. Lenore Badgett was then employed as a housekeeper at Mr. Garfield's residence at Belmar and her son, who was courting Barbara, was frequently accompanied by Barbara on his visits to meet his mother at the Garfield home.
*346 On one such occasion in the month of January 1952 Mr. Garfield fortuitously observed that Barbara was scarcely able to walk, and he discovered that her foot and ankle were exceedingly swollen and conspicuously discolored. He elicited from her the information that she had sustained the injury two or three days previously while playing basketball at the high school and that her parents deemed the painful injury to be nothing more than a sprain, hence they declined to provide her any medical aid.
Mr. Garfield in the exercise of good judgment promptly dispatched Mrs. Badgett, her son, and Barbara to the nearby office of Dr. Greenspan, who by means of X-rays discovered that a bone of the foot had been fractured. A cast was applied. Barbara was thereafter obliged to use crutches until the removal of the cast by Dr. Greenspan on February 11, 1952. Barbara resided with her parents and the presence of the cast and the use of crutches must have been apparent to them.
Upon the completion of his services Dr. Greenspan rendered a bill to the parents in the sum of $45 which they have refused to pay.
At the trial of this action to recover from the defendants the reasonable value of the professional services so performed, Dr. Greenspan testified that had not proper medical care and attention been devoted to the injury at the time, permanent injury would have resulted. He verified the reasonableness of a charge of at least $35. He frankly acknowledged that he had not been consulted or employed by the defendants.
The record reveals the following statement of the outcome of the action:
"Defendants moved for a judgment in their behalf on the ground that they did not authorize such services to be rendered to Barbara. The Court granted the motion and entered judgment in favor of the defendants." (Emphasis supplied.)
"Authorization not having been established by the plaintiffs, judgment in favor of the defendants was in order and accordingly granted on motion."
*347 Medical care, once commonly termed "physic" was considered to be within the category of necessities as long ago as Lord Coke's time. Early decisions too numerous specifically to cite have uniformly held that necessaries for an infant include "necessary meat, drink, apparel and physic." Chancellor Kent was heard to say, "The wants and weaknesses of children render it necessary that some person maintains them, and the voice of nature has pointed out the parent as the most fit and proper person." 2 Kent's Com. 189, 190.
In view of the nature of the injury and the refusal of the father to provide medical attention, there is no hesitation in classifying the care and treatment given in the exigent circumstances of the present case as a necessary. Indeed, modern authorities manifest a tendency to enlarge the term "necessary" to encircle many of the conveniences of modern refined life, according to the circumstances and conditions of those concerned.
But the fundamental question confronts us whether in the existing state of the law in this State an action is maintainable against a father or mother for the reasonable cost of necessaries furnished by another to their infant child in their custody unless the parent has expressly or impliedly authorized the expenditure on his or her credit.
It seems shocking to hear that a financially resourceful father whose infant child is, for example, run over by an automobile on her way to school, and through the humanitarian sensibilities of a passing motorist is hastily taken to the office of a physician where she is given emergent professional care and attention, can legally escape all liability for perhaps the life-saving services of the physician. You would not suppose that such a parent exists, but that is beside the point.
Many are the jurisdictions in which the decisional law is that in recognition of a principle of the natural law a parent is under an obligation to furnish necessaries for his infant children of his household, and if the parent neglects *348 or declines to fulfill that duty, any other person who supplies such necessaries is deemed to have conferred a benefit on the delinquent or obstinate parent, for which the law originates an implied promise to pay on the part of the parent. The decision in De Brauwere v. De Brauwere, 203 N.Y. 460, 96 N.E. 722, 38 L.R.A., N.S., 508 (Ct. App. 1911), is typical. It has also been thought that the liability of the parent for his failure to provide necessaries to his child is founded in tort. Wintrode v. Connors, 67 Ohio App. 106, 35 N.E.2d 1018 (1941).
Some courts have chosen to spin out a symmetrical pattern of reciprocal rights and duties and have evolved the rule that the parental obligation to provide necessaries is a correlative of the right of custody and the right to the services of the infant child.
Whether the common law imposed any legal duty upon a parent even to support a minor child remains obscure, but there are many authoritative assurances that if some such duty was recognized, it could not be enforced in a civil action. Blackstone described the duty as a natural one, and Chitty indicated that, in the absence of express enactment, the obligation was not a legal one. 1 Bl. Com. (Chitty's ed. 1826), 447, 448.
Legislation has since been enacted in all or all but one of the states imposing in various measures a duty upon parents to support their children. Vide, Vernier, Am. Family Laws, p. 57; N.J.S. 2A:100-2. Has not the moral obligation at common law been transformed into a legal obligation? Where as now the parent who neglects or refuses to provide for the maintenance of his or her minor child in necessitous circumstances is guilty of a criminal offense, it would seem logically and sensibly to follow that such a parent ought to be held legally responsible to one who in emergent circumstances has furnished the necessaries to the child. Rights and duties should be shaped to fit the complexities of modern life. The law should be made loyal to its ideal of justice. Is it justice to permit an unnatural father to subject his dependent *349 child to the polar frost of indifference, thereby oblige another to give her warmth, and then invoke the law to liberate him from all civil responsibility for the consequences of his delinquency? Let him have a defense but not defiance.
No one doubts today the liability of a husband to pay for necessaries furnished to his wife without his express or implied authority. The wife is not the agent of her husband in the absence of his authority expressly conferred or reasonably to be implied from the circumstances. But the law from considerations of public policy and the general welfare has created in such cases an "agency from necessity." Smedley v. Sweeten, 11 N.J. Super. 39 (App. Div. 1950). Do our own courts with some illogical inconsistency continue theoretically to regard the child of the marriage in the conception of the law as a mere domestic animal whose necessaries, even in an emergency, are, at the father's will, dependent upon private or public charity? It seems so.
Such was the announcement of our law in the decision of the case of In re Ganey, 93 N.J. Eq. 389 (Ch. 1921), affirmed 94 N.J. Eq. 502 (E. & A. 1923), and followed compliantly by the recent decisions in Kopack v. Polzer, 5 N.J. Super. 114 (App. Div. 1949), affirmed 4 N.J. 327 (1950), and in Cohen v. Cohen, 6 N.J. Super. 26 (App. Div. 1949). See, also, Freeman v. Robinson, 38 N.J.L. 383 (Sup. Ct. 1876); Alling v. Alling, 52 N.J. Eq. 92 (Ch. 1893). One precedent propagates another. They soon accumulate like acorns beneath the trees of a forest and constitute the established law.
A diligent research of the pertinent authorities also exposes the aged decision of Chancellor Williamson in Tomkins v. Tomkins, 11 N.J. Eq. 512 (Ch. 1858), in which he stated:
"* * * The position taken by the complainant's counsel is, that a parent is under no legal obligation to support his child, and that whoever furnishes a child with necessaries, must do it gratuitously; that no recovery can be had for such necessaries, unless they were furnished under an express contract with the parents. What was *350 said by the judges in the cases of Urmston v. Newcomer, 4 Ad. & Ellis 899; 31 E.C.L.; Mortimore v. Wright, 6 M. & W. 48, would seem to sustain the position. Such is not the law in New Jersey. The law, as it has been adopted in this state, is as laid down by the court in Van Valkinburgh v. Watson and Watson, 13 J.R. 480. A parent is bound to provide his infant children with necessaries; and if he neglect to do so, a third person may supply them, and charge the parent with the amount. But such third person must take notice of what is necessary for the infant, according to his situation in life; and where the infant lives with his parent, and is provided for by him, a person furnishing necessaries cannot charge the parent. `When the infant is sub potestate parentis, there must be a clear and palpable omission of duty, in that respect, on the part of the parent, in order to authorize any other person to act for, and charge the expense to the parent.'"
The indispensable requirement of proof of the parental relationship and that the articles furnished or services performed were in the factual circumstances necessaries within the import of the law, is an adequate protection of the parent against an unwarranted invasion of his credit and the indiscretions of the minor child. Moreover the legal presumption of implied authority is not conclusive. It may be overcome by refutatory evidence. Compare, Saks & Co. v. Barrett, 109 N.J.L. 42 (E. & A. 1932); Gimbel Bros., Inc. v. Barrett, 109 N.J.L. 63 (E. & A. 1932).
Even so, it must be acknowledged that the judgment here under review was entered in accordance with the decisions in the Freeman and Ganey cases, the latter of which was unanimously approved by our former Court of Errors and Appeals.
It may be conjectured that the trial judge found himself enlisted in that brigade to whom it was said:

"Yours not to reason why, Yours but to just comply."
The author of this opinion feels constrained to resurrect the following quotation from his decision in Carroll v. Local No. 269, etc., Electrical Workers, 133 N.J. Eq. 144, 148 (Ch. 1943):
*351 "It is the peculiar genius and strength of the common law that no decision is stare decisis when it has lost its usefulness in our social evolution; it is distinguished, and if times have sufficiently changed, overruled. Judicial opinions do not always preserve the social statics of another generation."
Inversions and modifications of the existing decisional law more appropriately abide within the domain of the court of last resort.
The judgment is reluctantly affirmed. No costs.